## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **STATE OF KANSAS,**<br>***ex rel. Derek Schmidt, Attorney General,***<br>**State of Kansas, and BOARD OF**<br>**COUNTY COMMISSIONERS OF**<br>**CHEROKEE COUNTY, KANSAS,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**NATIONAL INDIAN**<br>**GAMING COMMISSION,** *et al.*,<br><br>**Defendants.** | **Case No. 15-CV-4857-DDC-KGS** |

## MEMORANDUM AND ORDER

Plaintiffs, the State of Kansas and the Board of County Commissioners of Cherokee

County, Kansas, bring this action.  They seek declaratory and injunctive relief under the

Administrative Procedure Act, 5 U.S.C. §§ 701, *et seq.*; the Indian Gaming Regulatory Act, 25

U.S.C. §§ 2701, *et seq.*; the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02; and the United

States Constitution.  They assert claims against two distinct groups of defendants.  This Order

refers to the first group, consisting of the National Indian Gaming Commission, Chair Jonodev

Osceloa Chaudhuri, Associate Commissioner Daniel J. Little, General Counsel Eric N. Shepard,

the U.S. Department of the Interior, Secretary of the Interior Sally Jewell, and Assistant

Secretary of Indian Affairs Kevin K. Washburn, as the "federal defendants."  It refers to the

second group, consisting of the Downstream Development Authority of the Quapaw Tribe of

Oklahoma, the Quapaw Casino Authority of the Quapaw Tribe of Oklahoma, the Quapaw Tribal

Development Corporation, and 18 individual officers and members of the tribal entities, as the

"tribal defendants."

This matter is before the Court on multiple motions to dismiss.  The federal defendants filed a Motion to Dismiss Amended Complaint (Doc. 42).  The tribal defendants filed five, nearly identical Motions to Dismiss (Docs. 50, 55, 68, 76, 86) after receiving service of plaintiffs' Amended Complaint (Doc. 13) at different times.  Plaintiffs have responded to all motions and both the federal defendants and tribal defendants have filed replies.  For reasons explained below, the Court grants the motions filed by both groups of defendants.

## I.   Factual Background

### A.  Acronyms and Other Abbreviations

To express its ruling on the motions, the Court must refer to a number of agencies, other entities, and various regulatory and legislative provisions.  Hoping to assist those who read this Order, the Court begins with a glossary of acronyms and other abbreviated jargon it uses.

| Defined Term | Meaning |
|---|---|
| "APA" | Administrative Procedure Act |
| "BIA" | Bureau of Indian Affairs |
| "DDA" | Downstream Development Authority of the Quapaw Tribe of Oklahoma |
| "DJA" | Declaratory Judgment Act |
| "DOI" | United States Department of the Interior |
| "IGRA" | Indian Gaming Regulatory Act |
| "NIGC" | National Indian Gaming Commission |
| "OGC" | National Indian Gaming Commission Office of General Counsel |
| "TDC" | Quapaw Tribal Development Corporation |
| "QCA" | Quapaw Casino Authority of the Quapaw Tribe of Oklahoma |
| "Quapaw" | Quapaw Tribe of Oklahoma |

2

### B.  Relevant History

The Quapaw is a federally recognized Indian tribe.  In 1833, the Quapaw entered into a treaty with the United States.  Under the terms of that treaty, the Quapaw agreed to leave its original territory in Arkansas and relocate to a reservation located near what later became the border separating Oklahoma and Kansas.  The Quapaw reservation encompassed 150 sections of land, and the majority of those sections were located on the Oklahoma side of the state boundary. The Kansas portion, known as the "Quapaw Strip," extended only one-half mile north of the state border.  On February 23, 1867, the Quapaw ceded the Quapaw Strip—except for a small parcel set aside for one Quapaw member—to the United States.  In 1895, the United States dissolved the remainder of the Quapaw reservation and allotted the Quapaw's Oklahoma land to individual members of the Quapaw Tribe under the Act of March 2, 1895.  *See* ch. 188, 28 Stat. 876, 907 (1895).

Years later, the Quapaw purchased a tract of land in Oklahoma.  The tract is adjacent to the Kansas-Oklahoma border and within the historic boundaries of the Quapaw's reservation. The Quapaw placed the land it had acquired into a trust with the Secretary of the Interior shortly after acquiring it.  In 2006, the Quapaw purchased a 124-acre tract of land in Cherokee County, Kansas (the "Kansas Land").  It too is directly adjacent to the Kansas-Oklahoma border and entirely within the historic boundaries of the Quapaw's reservation—*i.e.*, the Quapaw Strip.

In 2008, the Quapaw opened the Downstream Casino Resort on its Oklahoma trust land, just south of the Kansas-Oklahoma border.  The Quapaw constructed the primary parking lot, several ancillary facilities, and other infrastructure for the Downstream Casino across the Kansas-Oklahoma border on the Kansas Land.

On April 25, 2011, the Quapaw notified the State of Kansas that it had filed an application with the DOI to have the Kansas Land taken into trust.  The Quapaw titled the notice a "Notice of (Gaming) Land Acquisition Application."  Doc. 13-3 at 5.  Part of this application called on the Quapaw to provide information about "Project Description/Proposed Land Use."  In response, the Quapaw stated:  "[the] property is to be used for additional parking for the Downstream Resort/Casino."  *Id*. at 6 (emphasis omitted).

On February 6, 2012, Kansas Governor Sam Brownback received a similar notice from the BIA, informing him that the Quapaw had filed a "land into trust" application.  The BIA titled its notice a "Notice of (Non-Gaming) Land Acquisition Application."  Doc. 13-2 at 1 (emphasis omitted).  The BIA described the Quapaw's proposed use of the Kansas land as follows:

> The property is commonly identified as the "Downstream Parking Lot."  A portion of the property is currently an existing parking lot and the Tribe plans to continue with that use.  A portion of the property is primarily agricultural and there are no plans for development of this property at this time.  Therefore, there is no expected change in use of the property at this time.

*Id*. at 2.  To inform the BIA's decision whether to take the Kansas Land into trust, the BIA's notice invited the State to submit written comments about the Quapaw's application.

The State submitted objections about the Quapaw's application to the BIA on March 5, 2012.  The State based its primary objection "on a concern that [the Kansas Land] would be used for expanded gaming operation[s]."  Doc. 13-3 at 1.  The State attached a copy of the Quapaw's April 25, 2011 notice—titled a "Notice of (Gaming) Land Acquisition Application"—to its objections and also opined that "[i]t would seem, based on this letter's express reference to 'gaming,' that expanded gaming on this parcel is indeed possible.  Although, the BIA's letter of February 3, [2012], is a notice of 'non-gaming' acquisition, that is not legally determinative of

the tribe's proposed use of the land." *Id.* The State also objected to the BIA's consideration of the application as an "on-reservation" request. *Id.*

Plaintiff Cherokee County sent the BIA a letter echoing the State's objections. *See* Doc. 15-3 at 2. But the County later withdrew its objections, explaining: "After consultation with local elected officials, business and community leaders[,] and residents from . . . Cherokee County, the Commission believes it is in the County's best interests to withdraw[] their prior letter of opposition." Doc. 15-3 at 3.

The BIA took the Kansas Land into trust on June 8, 2012. In doing so, the BIA concluded that the Quapaw's "request adequately describe[d] the purpose for which the land will be used." Doc. 13-4 at 3. In response to the State's objection about the application being an "on-reservation" request, the BIA concluded that 25 C.F.R. § 151.3(a)(1) permitted the BIA to take the land into trust because it was "contiguous and adjacent to the historic reservation boundaries of the [Quapaw] Tribe." Doc. 13-4 at 4. The State did not appeal the BIA's decision.

In early 2013, the Quapaw asked the Office of General Counsel for the National Indian Gaming Commission to issue an advisory opinion addressing whether the Kansas Land satisfied the "last recognized reservation" exception to the IGRA's prohibition against gaming on trust lands acquired after October 17, 1988. *See* 25 U.S.C. § 2719(a)(2)(B). This exception provides:

(a) Prohibition on lands acquired in trust by Secretary

Except as provided in subsection (b) of this section, gaming regulated by this chapter shall not be conducted on lands acquired by the secretary in trust for the benefit of an Indian tribe after October 17, 1988, unless--

. . .

(2) the Indian tribe has no reservation on October 17, 1988, and--

. . .

> (B) such lands are located in a State other than Oklahoma and are within the Indian tribe's last recognized reservation within the State or States within which such Indian tribe is presently located.

*Id*.

As part of its analysis of the Quapaw's request, the OGC sent a letter to Kansas Attorney General Derek Schmidt (the "Kansas AG" or "General Schmidt") notifying him of the Quapaw's request and soliciting his comments. *See* Doc. 13-6. General Schmidt's office responded on June 21, 2013. *See* Doc. 13-7. This response advanced two arguments against the capacity of the Kansas Land to qualify under the IGRA's last recognized reservation exception. First, because the Quapaw had placed the Kansas Land in trust for non-gaming purposes, the Kansas AG asserted that the Quapaw should be "equitably estopped from putting forth this parcel as one appropriate for gaming." Doc. 13-7 at 2. Second, the Kansas AG contended that the Quapaw's presence in Kansas did not satisfy the exception's requirement that it be "presently located" within the state. The Kansas AG noted that only one case had interpreted the term "presently located," as used in § 2719 of the IGRA. *See Wyandotte Nation v. NIGC*, 437 F. Supp. 2d 1193 (D. Kan. 2006) (cited by General Schmidt in Doc. 13-7 at 2). According to the Kansas AG, the *Wyandotte Nation* decision held that a tribe is "presently located" in a state where it has a population center and a "major governmental presence." Doc. 13-7 at 2 (citing *Wyandotte Nation*, 437 F. Supp. 2d at 1206). The Kansas AG argued that the Quapaw lacked such a presence in Kansas and thus did not meet this requirement in § 2719(a)(2)(b). In addition, the Kansas AG asserted that the Quapaw's present location must be determined as of October 17, 1988, the effective date of the IGRA. The Kansas AG cited the Supreme Court's interpretation of the term "now under federal jurisdiction"—as used in the Indian Reorganization Act—to support this contention. *See id*. (citing *Carcieri v. Salazar*, 555 U.S. 379 (2009)).

The OGC issued an advisory opinion on November 21, 2014.  In it, the OGC opined that the Quapaw's Kansas Land was eligible for gaming under the IGRA.  The OGC also opined that the Quapaw was "presently located" in Kansas under the terms of 25 C.F.R. § 292.4(b)(2), a DOI regulation implementing the IGRA.  This regulation—enacted two years after *Wyandotte Nation*—provides that an Indian tribe without a reservation on October 17, 1988, satisfies the last recognized reservation exception if its land is "located in a State other than Oklahoma and within the tribe's last recognized reservation within the State or States within which the tribe is presently located, *as evidenced by the tribe's governmental presence and tribal population*."  25 C.F.R. § 292.4(b)(2) (emphasis added).  The OGC's opinion did not explicitly address the arguments advanced by the Kansas AG's written comments.  But the OGC did note the conflicting interpretations of the term "presently located" in *Wyandotte Nation* and 25 C.F.R. § 292.4(b)(2).  The OGC explained its decision to follow the regulatory meaning of that term over the one favored in *Wyandotte Nation*, asserting that the DOI's regulatory definition deserved deference under *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984).  And after analyzing the Quapaw's population and governmental presence in Kansas, the OGC opined that the Quapaw met the requirements of 25 U.S.C. § 2719 and thus could engage in gaming on the Kansas Land.

Plaintiffs filed this lawsuit on March 9, 2015.  Their Amended Complaint asserts four causes of action, advancing two claims against the federal defendants.  Specifically, plaintiffs ask the Court to review the OGC's advisory opinion and declare the OGC's application of the last recognized reservation exception arbitrary and capricious under the APA and IGRA.  The Amended Complaint also challenges the federal defendants' promulgation and application of 25 C.F.R. § 292.4(b)(2) because, plaintiffs claim, the federal defendants failed to consider and

incorporate the tribal location standards adopted in *Wyandotte Nation* and *Carcieri*.  Plaintiffs'

two other claims ask the Court to apply the doctrine of equitable estoppel against the tribal

defendants and thus enjoin them from constructing a casino on the Kansas Land.

The tribal defendants, the NIGC, and the individual NIGC officials all have moved for

dismissal of plaintiffs' claims under Fed. R. Civ. P. 12(b)(1).  They contend that sovereign

immunity precludes the Court from exercising jurisdiction.  Also, all defendants ask the Court to

dismiss plaintiffs' claims under Rule 12(b)(6) because they fail to assert viable claims under the

APA, IGRA, DJA, and federal common law.

## II.    Legal Standards

"Different standards apply to a motion to dismiss based on lack of subject matter

jurisdiction under Rule 12(b)(1) and a motion to dismiss for failure to state a claim under Rule

12(b)(6)."  *Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1167 (10th Cir. 2012).  When

faced with motions for dismissal relying on both aspects of Rule 12, a court must first determine

whether it has subject matter jurisdiction over the controversy before addressing the merits of the

case under a Rule 12(b)(6) analysis.  *Bell v. Hood*, 327 U.S. 678, 682 (1946) ("Whether the

complaint states a cause of action on which relief could be granted is a question of law and just

as issues of fact it must be decided after and not before the court has assumed jurisdiction over

the controversy.").  Thus, the Court, first, must decide whether it has subject matter jurisdiction

over the claims brought against each defendant group before it can address the merits of those

claims.

### A.  Rule 12(b)(1)

"Motions to dismiss for lack of subject matter jurisdiction 'generally take one of two

forms:  (1) a facial attack on the sufficiency of the complaint's allegations as to subject matter

jurisdiction; or (2) a challenge to the actual facts upon which subject matter jurisdiction is based.'"  *City of Albuquerque v. U.S. Dep't of Interior*, 379 F.3d 901, 906 (10th Cir. 2004) (quoting *Ruiz v. McDonnell*, 299 F.3d 1173, 1180 (10th Cir. 2002), *cert. denied*, 538 U.S. 999 (2003)).  If the motion challenges the sufficiency of the complaint's jurisdictional allegations, the district court must accept all such allegations as true.  *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995).  But the analysis differs if the movant goes beyond the complaint's allegations and challenges the facts on which subject matter jurisdiction depends.  In that circumstance, a court "may not presume the truthfulness of the complaint's factual allegations" and "has wide discretion to allow affidavits [and] other documents . . . to resolve disputed jurisdictional facts under Rule 12(b)(1)."  *Id*. at 1003.

In this setting, referencing material outside the pleadings does not convert the motion to dismiss into one seeking summary judgment under Rule 56.  *Id*. (citing *Wheeler v. Hurdman*, 825 F.2d 257, 259 (10th Cir.), *cert. denied*, 484 U.S. 986 (1987)).  But the Court must "convert a Rule 12(b)(1) motion to dismiss into a Rule 12(b)(6) motion or a Rule 56 summary judgment motion when resolution of the jurisdictional question is intertwined with the merits of the case."  *Id*.  Such a situation exists where resolving "the jurisdictional question requires resolution of an aspect of the substantive claim."  *Pringle v. United States*, 208 F.3d 1220, 1223 (10th Cir. 2000).  Because federal courts are courts of limited jurisdiction, a presumption exists against jurisdiction, and "the burden of establishing the contrary rests upon the party asserting jurisdiction."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citing *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 182-83 (1936)).

## B.  Rule 12(b)(6)

Defendants also seek to dismiss plaintiffs' Amended Complaint under Fed. R. Civ. P. 12(b)(6), claiming it fails to state a claim upon which the Court can grant relief.  Fed. R. Civ. P. 8(a)(2) requires a federal court complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Although this Rule "does not require 'detailed factual allegations,'" it demands more than "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" which, as the Supreme Court has explained, simply "will not do."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  "Under this standard, 'the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims.'"  *Carter v. United States*, 667 F. Supp. 2d 1259, 1262 (D. Kan. 2009) (quoting *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis in original)).

Although the Court must assume that the factual allegations in the complaint are true, it is "'not bound to accept as true a legal conclusion couched as a factual allegation.'"  *Id.* at 1263 (quoting *Iqbal*, 556 U.S. at 678).  And "'[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice'" to state a claim for relief.  *Bixler v. Foster*, 596 F.3d 751, 756 (10th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 678).

When evaluating a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court may consider the complaint itself along with any attached exhibits and documents incorporated into it by reference. *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *TMJ Implants, Inc. v. Aetna, Inc.*, 498 F.3d 1175, 1180 (10th Cir. 2007); *Indus. Constructors Corp. v. U. S. Bureau of Reclamation*, 15 F.3d 963, 964-65 (10th Cir. 1994)).  Also, a court "'may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity.'" *Id.* (quoting *Alvarado v. KOB–TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007) (internal quotation omitted)).

## III.    Federal Defendants' Motion to Dismiss

Plaintiffs' Amended Complaint asserts two claims against the federal defendants.  First, it asks the Court to declare the OGC's advisory opinion is arbitrary and capricious.  Plaintiffs contend that the OGC has misapplied the IGRA's "last recognized reservation" exception and erred by refusing to invoke equitable estoppel to bar the Quapaw from gaming on the Kansas Land.  Second, the Amended Complaint asks the Court to declare the federal defendants' enactment and application of 25 C.F.R. § 292.4(b)(2) arbitrary and capricious because its definition of where a tribe is "presently located," as that term is used in the IGRA, is inconsistent with *Wyandotte Nation* and *Carcieri*.

The federal defendants attack these theories for relief under both Rule 12(b)(1) and Rule 12(b)(6), contending, first, that the Court lacks subject matter jurisdiction over the claims levied against defendant NIGC and its officers.  According to the federal defendants, the OGC's advisory opinion is not "final agency action" within the NIGC's limited waiver of its sovereign immunity, and thus is not subject to judicial review.  Alternatively, and if the Court concludes

11

that the OGC's opinion is subject to judicial review, the federal defendants contend the Court

should dismiss under Rule 12(b)(6).  This argument contends that plaintiffs' attack on 25 C.F.R.

§ 292.4(b)(2) fails to state a claim on which relief can be granted.  These alternative attacks

implicate two distinct sets of legal principles.  The Court thus addresses them separately,

beginning with the jurisdictional issue, below.

### A.  Motion to Dismiss Under Rule 12(b)(1) for Lack of Subject Matter Jurisdiction

Consistent with *Bell v. Hood*, the Court first considers the federal defendants'

jurisdictional attack under Rule 12(b)(1).  *See* 327 U.S. at 682.  Because this aspect of the federal

defendants' motion challenges the sufficiency of plaintiffs' jurisdictional allegations, the Court

accepts as true all factual allegations made by the Amended Complaint.  *See Holt*, 46 F.3d at

1003.

### 1.  Sovereign immunity principles under the APA

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies

from suit."  *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994).  Any waiver of "sovereign immunity

must be unequivocally expressed in statutory text."  *Lane v. Pena*, 518 U.S. 187, 192 (1996)

(citing *United States v. Nordic Village, Inc.*, 503 U.S. 30, 33-34 (1992)).  Waivers of immunity

by the United States or one of its agencies "will not be implied" and any waiver is "strictly

construed, in terms of its scope, in favor of the sovereign."  *Id*. (citing *United States v. Williams*,

514 U.S. 527, 531 (1995)).

The APA contains a limited waiver of sovereign immunity.  It permits a "person

suffering legal wrong because of agency action, or adversely affected or aggrieved by agency

action within the meaning of a relevant statute" to seek judicial review.  5 U.S.C. § 702.

Establishing standing to challenge agency action under § 702 of the APA is a two-step process.

First, "a plaintiff must . . . identify 'final agency action.'" *Kansas v. United States*, 249 F.3d 1213, 1222 (10th Cir. 2001) (citing 5 U.S.C. § 704); *see also Friends of Marolt Park v. U.S. Dep't of Transp.*, 382 F.3d 1088, 1093-94 (10th Cir. 2004) ("Ordinarily, whether the issues are fit for review depends on whether the plaintiffs challenge a final agency action.").  Next, the plaintiff must demonstrate that the agency action "subjects plaintiff to a 'legal wrong,' or 'adversely affects or aggrieves' plaintiff 'within the meaning of the relevant statute.'"  *Kansas*, 249 F.3d at 1222 (quoting 5 U.S.C. § 702).  This step injects a prudential standing requirement into § 702, requiring plaintiffs to demonstrate that the interest they seek to protect is "'*arguably* within the zone of interests to be protected or regulated by the statute in question.'"  *Id.* (quoting *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 488 (1998)) (emphasis in original).

### 2.  Final agency action under the IGRA

Plaintiffs, as the parties seeking judicial review, bear the burden to establish that the OGC's advisory opinion amounts to final agency action by the NIGC and thus lies within the APA's limited wavier of sovereign immunity.  *See Catron Cty. Bd. of Comm'rs, N.M. v. U.S. Fish & Wildlife Serv.*, 75 F.3d 1429, 1434 (10th Cir. 1996) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990)).

Section 2714 of the IGRA explicitly identifies which NIGC actions are final for purposes of judicial review under the APA.  It provides:

> Decisions by the Commission pursuant to Sections 2710, 2711, 2712, and 2713 of this title shall be final agency decisions for the purposes of appeal to the appropriate Federal district court pursuant to [the APA].

25 U.S.C. § 2714.  This statute's reference to four sections of the IGRA identifies the following as final agency actions by the NIGC:  (1) actions affecting or denying tribal gaming ordinances

(under § 2710); (2) actions approving or denying gaming management contracts (under § 2711); (3) actions reviewing existing tribal gaming ordinances or contracts (under § 2712); and (4) actions imposing civil penalties (under § 2713).  In contrast, nothing in § 2714 or any other part of the IGRA identifies OGC advisory opinions as final agency action.

Consistent with this omission, Tenth Circuit precedent suggests that opinions issued by the OGC do not amount to final agency action under the IGRA.  *See Oklahoma v. Hobia*, 775 F.3d 1204, 1210 (10th Cir. 2014) (holding that NIGC chairwoman's letter adopting OGC's opinion was not final agency action because § 2714 defines "what constitutes 'final agency action' under the IGRA."); *Miami Tribe of Okla. v. United States*, 198 F. App'x 686, 690 (10th Cir. 2006) (concluding that DOI advisory opinion interpreting the IGRA was not a final agency action because it was "only part of the process that will eventually result in the final NIGC action.").  The Circuit's ruling in *Hobia* is particularly instructive.

There, an Indian tribe had informed the NIGC that it intended to license a casino on land it did not own.  *See Hobia*, 775 F.3d at 1209.  After reviewing the tribe's submission, the OGC issued a memorandum to the NIGC Chairwoman, opining that the casino property did not qualify as "Indian lands," as the IGRA requires, and, therefore, was ineligible for gaming.  *Id.*  The Chairwoman sent a letter to the tribe adopting the OGC's memorandum and threatening to order the temporary closure of the casino under 25 U.S.C. § 2713(b) if gaming occurred.  *Id.*  The Tenth Circuit held that the Chairwoman's letter did not amount to final agency action because it "anticipated the possibility of future wrongful conduct on the part of the Tribe, i.e., conducting gaming on the Property, and in turn future agency action, i.e., a hearing before the Commission and a final decision as to whether to permanently close the Tribe's gaming facility," as required by § 2713(b)(2) of the IGRA.  *Id.* at 1211.

The OGC's advisory opinion here is similar to the Chairwoman's letter in *Hobia*.  Here, the OGC has opined that the Quapaw's Kansas Land is eligible for gaming under the IGRA.  His conclusion is neither legally definitive nor binding on the NIGC or its Chairman.  *See* Doc. 13-8 at 15 (stating that the advisory opinion "does not constitute final agency action for purposes of review in federal district court").  Instead, the Chairman may disagree with the OGC's opinion.  In that case, § 2713 permits the Chairman temporarily to close any gaming facility operating on the Kansas Land in violation of the IGRA.  *See* 25 U.S.C. § 2713(b)(1).  And, as in *Hobia*, such an order would not become final agency action until the NIGC conducts a hearing and decides whether to close the facility permanently or dissolve the Chairman's temporary order.  *See Hobia*, 775 F.3d at 1211 (quoting 25 U.S.C. § 2713(b)(2)).  *Hobia* also explained how the Chairman's enforcement of the IGRA progresses to final agency action:

> Section 2713(b) of the IGRA addresses '[t]emporary closure' orders and provides that, '[n]ot later than thirty days after the issuance by the Chairman of an order of temporary closure, the Indian tribe . . . involved shall have the right to a hearing before the Commission to determine whether such order should be made permanent or dissolved.'  25 U.S.C. § 2713(b)(2).  Section 2713(c) in turn provides that '[a] decision of the Commission . . . to order a permanent closure pursuant to this section shall be appealable to the appropriate Federal district court.'  25 U.S.C. § 2713(c).

*Id.* at 1210.

Hoping to overcome this statutory language and Circuit precedent, plaintiffs make two arguments.  First, they contend that the IGRA's legislative history indicates that § 2714 does not provide an exhaustive list of final NIGC actions subject to judicial review.  Second, plaintiffs argue that the OGC's advisory opinion satisfies the Supreme Court's test for determining whether agency action is final under the APA.  Neither argument is persuasive, however, and the next two subsections explain why.

### a.   Plaintiffs' legislative history argument

Plaintiffs' legislative history argument begins in the wrong place.  It presupposes that it is appropriate for the Court to examine the IGRA's legislative history.  The Court rejects this premise.  A federal court can consider legislative history only when it finds that a statute's terms are unclear or ambiguous.  *See United States v. Brian N.*, 900 F.2d 218, 221 (10th Cir. 1990) ("Normally when we find a statute's terms to be unambiguous, our inquiry is complete.") (citing *Burlington N. R.R. Co. v. Okla. Tax Comm'n*, 481 U.S. 454, 461 (1987)); *see also In re Roberts*, 906 F.2d 1440, 1442 (10th Cir. 1990) ("Such an expression of contrary legislative intent must appear on the face of the statute, read in its entirety; beyond the statute itself, legislative history should be used to resolve ambiguity, not create it.") (internal quotation omitted).

Here, the Court concludes that § 2714 provides clear and unambiguous direction about which NIGC actions are final and thus subject to judicial review under the APA.  A "frequently stated principle of statutory construction is that when legislation expressly provides a particular remedy or remedies, courts should not expand coverage of the statute to subsume other remedies." *Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*, 414 U.S. 453, 458 (1974); *see also Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 208 (1994) (holding that statutory provisions creating right to judicial review for one party do not create a corresponding right for another party that the statute did not mention).  When it passed the IGRA, Congress defined which actions by the NIGC amounted to final agency actions subject to judicial review. *See* 25 U.S.C. § 2714.  No words in this provision suggest that Congress' definition reaches other forms of agency action such as the OGC advisory opinion at issue here.

But, even if it were proper to consider § 2714's legislative history, this history does not support plaintiffs' argument.  In fact, it refutes plaintiffs' argument.  Plaintiffs' argument relies

on the "Highlights" section of Senate Report 100-446.  In relevant part, these Highlights state:

"All decisions of the Commission are final agency decisions for purposes of appeal to Federal

district court."  S. Rep. No. 100-446, at 8 (1988).  But later, this same Report explains that only

"certain Commission decisions will be final agency decisions for purposes of court review."  *Id.*

at 20.  Indeed, other federal courts have concluded that § 2714's legislative history will not

support the proposition that an OGC advisory opinion is final agency action subject to judicial

review.  Specifically, the District Court for the Northern District of Oklahoma has held:

> A proper analysis of the IGRA illustrates Congress's intent to provide only
> limited review under the Act.  In considering the IGRA, the Senate stated that
> Section 15 of the Act[1] provides "that certain Commission decisions will be final
> agency provisions for purposes of court review."  Senate Report 100-446 at 20,
> 1998 U.S.C.C.A.N. 3071, 3090.  *Thus, it is clear that Congress intended that a*
> *final order be a prerequisite for judicial review since the only reference to*
> *judicial review mandate[s] that there must be a decision by the Commission*
> *pursuant to only certain sections of the IGRA for it to be considered a final*
> *action*.  *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 208, 114 S. Ct. 771,
> 127 L.Ed.2d 29 (1994) (holding that Congress shows its intent to preclude judicial
> review where it creates a scheme permitting judicial review only for certain
> actions).
>
> The omission of a provision thereby shows Congressional intent to prohibit
> judicial review over any other agency actions as opposed to the few already
> granted express jurisdiction.  Additionally, further evidence of preclusion can be
> found in § 2714.  That section explicitly states that the decisions capable of
> judicial review are "[d]ecisions made by the Commission."  *See* 28 U.S.C. § 2714.
> Because Chairman issued orders must be reviewed by the full Commission upon
> appeal before it is considered a final agency action, the IGRA then does not
> consider these orders "decisions" that warrant a forum in federal district courts.
> *Thus, an advisory opinion letter from the NIGC's General Counsel office does not*
> *rise to the level of a decision from the Commission.*

*Cheyenne-Arapaho Gaming Comm'n v. Nat'l Indian Gaming Comm'n*, 214 F. Supp. 2d 1155,

1171-72 (N.D. Okla. 2002) (emphasis added).  Similarly, the United States District Court for the

District of Columbia has determined that "the legislative history of the [IGRA] reflects an intent

to limit judicial review only to certain agency decisions, thereby overcoming the APA's

---

[1]      25 U.S.C. § 2714 codifies § 15 of the Act.

presumption of judicial review." *Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Ashcroft*, 360 F. Supp. 2d 64, 67 (D.D.C. 2004) (citing S. Rep. No. 100-446, at 20).

Plaintiffs' legislative history argument also invokes *United Keetoowah Band of Cherokee Indians v. State ex rel. Kuykendall*, No. CIV-04-340-WH, 2006 U.S. Dist. LEXIS 97268, at *1 (E.D. Okla. Jan. 26, 2006). *See* Doc. 60 at 4. But plaintiffs' reliance on this case reflects a truncated view of it.

In *United Keetoowah Band*, a tribe sought judicial review of a letter issued by the OGC. The letter reported "that the NIGC had reached the 'conclusion' that the Land [at issue] is not 'Indian land' as that term is defined by the IGRA, and that accordingly, the IGRA does not apply to Plaintiff's gaming" operations. *United Keetoowah Band*, 2006 U.S. Dist. LEXIS 97268, at *4-5. This "conclusion" "never went to the [NIGC's] Chairman or the full Commission for formal written approval." *Id*. at 5. But after the letter was issued, the NIGC acted upon it. It refused to accept the tribe's gaming operation reports, tried to refund all fees that the tribe previously had paid to the NIGC, and "ceased all regulation of plaintiff's gaming operation[s]." *Id*. This led the State of Oklahoma to announce its intention to pursue criminal sanctions against the tribe because their gaming operations violated state law. *Id*. On these facts, the Oklahoma federal court concluded that "the NIGC certainly appears to have treated [the OGC letter] as the consummation of the agency's decision-making process, and [thus] Plaintiff has suffered legal consequences" permitting judicial review. *Id*. at 17. The jurisdictional facts in the present case are materially different.

Here, the acting OGC has provided his "legal opinion" in a letter to counsel for the Quapaw. The letter is extensive—15 pages—and recites that the Solicitors Office of the DOI has reviewed the letter and concurs with its opinion. But the letter never asserts that it conveys a

decision reached by the Commission, or even that it portrays the view of the Commission's

Chair.  Instead, it professes a legal opinion about something it calls "a threshold question [that

must be considered] prior to considering whether the [Quapaw] Tribe exercises government

power over" the trust lands.  Doc. 13-8 at 5.  Indeed, the letter closes with an explicit statement

of what it is not:  "This legal opinion does not constitute final agency action for purposes of

review in federal district court."  *Id*. at 15.

Other material differences exist between the present case and *United Keetoowah Band*.

For example, plaintiffs never allege that the NIGC has acted to implement the OGC's legal

opinion.  In contrast, the Oklahoma court concluded that the NIGC had implemented the OGC's

legal conclusions in *United Keetoowah Band*.  *See* 2006 U.S. Dist. LEXIS 97268, at *5 (reciting

that the NIGC had refused the tribe's operational reports, attempted to return all fees paid to the

NIGC, and stopped regulating the tribe's gaming operations).

In sum, § 2714 of the IGRA unequivocally defines the actions that are final agency

decisions subject to judicial review under the APA.  The Court is not free to examine the Act's

legislative history looking for ways to expand the universe of decisions that Congress saw fit to

define as final agency action.  And even if the Court could consider the IGRA's legislative

history, it would not benefit plaintiffs.

### b.  The Supreme Court's test for determining whether agency action is final

Plaintiffs next argue that the OGC's advisory opinion is a reviewable, final action

because it satisfies the two-part test articulated by the Supreme Court in *Bennett v. Spear*, 520

U.S. 154, 177-78 (1997).  In *Bennett*, the Court held that an agency action is final under the APA

if it:  (1) marks "the 'consummation' of the agency's decisionmaking process;" and (2) is "one

by which 'rights or obligations have been determined' or from which 'legal consequences will

flow.'" *Id.* (internal citations omitted).  Here, plaintiffs note that the text of the IGRA does not require the NIGC to determine whether the Kansas Land satisfies the last recognized reservation exception before the Quapaw can build or license a class II or III gaming facility.  Thus, plaintiffs contend, the OGC's advisory opinion is the consummation of the NIGC's decision-making process because it is "the only definitive assessment by the NIGC of whether the Kansas land is eligible for gaming . . . ."  Doc. 60 at 6.  Plaintiffs also argue that the advisory opinion has imposed legal consequences because now, the State must negotiate a Tribal-State gaming compact with the Quapaw and the County must repair roads damaged by traffic from a future casino.

The federal defendants respond that plaintiffs' reliance on *Bennett* is misplaced given the Tenth Circuit's conclusion that the IGRA limits review of NIGC actions to those listed in § 2714.  *See Hobia*, 775 F.3d at 1210; *Miami Tribe of Okla.*, 198 F. App'x at 690.  The federal defendants also contend that, even if that precedent did not exist, the OGC's advisory opinion does not satisfy either prong of the *Bennett* test.  The federal defendants argue that the OGC's advisory opinion cannot meet the first prong of the *Bennett* test—*i.e.*, it does not consummate the NIGC's decision-making process—for two reasons.  First, the federal defendants assert that the letter is not a "decision" by the NIGC itself.  Instead, they contend that it is only "a staff member's letter opinion issued to the Tribe, who is not a party to this case."  Doc. 88 at 8.  Second, the federal defendants argue that the advisory opinion does not conclude the NIGC's decision-making process, "as numerous other (and truly final) agency actions may occur with respect to this tract of land."  *Id*. at 9.

The Court agrees that the OGC's advisory opinion does not constitute a final decision by the NIGC.  *See, e.g., St. Croix Chippewa Indians of Wis. v. Kempthorne*, No. 07-2210 (RJL),

2008 WL 4449620, at *5 (D.D.C. Sept. 30, 2008) ("Simply stated, a letter that merely advises the recipient of the agency's position does not amount to a 'consummation' of the agency's decision-making process."), *aff'd*, 384 F. App'x 7 (D.C. Cir. 2010); *NGV Gaming, Ltd. v. Upstream Point Molate, LLC*, 355 F. Supp. 2d 1061, 1065 (N.D. Cal. 2005) ("[T]he advisory opinion that the lease provisions violate IGRA has no legal effect because it is not a final decision of the agency."); *Lac Vieux Desert Band of Lake Superior Chippewa Indians*, 360 F. Supp. 2d at 68 (holding that the "IGRA specifically limits APA review to 'decisions of the Commission'" and "for the agency to take any official action, the Chairman or Commission must make a decision").  Indeed, the District Court for the Northern District of Oklahoma has held that a similar OGC advisory opinion was not final NIGC action, stating, in relevant part:

> The Court finds more probative the fact that the letter was not signed by the NIGC's chairman as all decisions are, but instead was issued under the name of the General Counsel.  *For the NIGC to take any official action, the Chairman or the Commission itself, on appeal, must make a decision.  See 25 U.S.C. § 2711, et. seq.  The General Counsel is simply a staff member of the NIGC advising the decision-makers and tribal entities when required*.  In this case, the Court finds that the advisory letter is simply courtesy correspondence offering the kind of guidance that is intended to prevent the need for official NIGC action.

*Cheyenne-Arapaho Gaming Comm'n*, 214 F. Supp. 2d at 1168 (emphasis added).

The court's reasoning in *Cheyenne-Arapaho Gaming Comm'n* applies equally here.  As plaintiffs concede, "[n]othing in the text of the IGRA    . . . requires the NIGC to determine whether the land meets the last recognized reservation exception" before the Quapaw licenses or constructs a class II or class III gaming facility.  Doc. 60 at 6.  Thus, the Quapaw's request for a legal opinion applying the exception was no more than a voluntary request for guidance from the NIGC staff.  Similarly, the OGC issued the advisory opinion voluntarily, and stated explicitly that his opinion "did not constitute final agency action for purposes of review in federal district court."  Doc. 13-8 at 15.  Notably, the OGC website explains the procedure for tribes, members

of the gaming industry, and other interested parties to request a legal opinion, stating, in relevant

part:

> As a general matter, legal opinions are issued by the OGC as a courtesy, and neither IGRA nor NIGC regulations require the OGC to issue a legal opinion on any matter.  Further, the legal opinion of the General Counsel is not agency action and the issuance of a legal opinion is a voluntary process, both for the party making the request and the OGC.

*Helpful Hints for Submitting Requests for a Legal Opinion to the NIGC Office of General Counsel*, 1 (Dec. 2013), http://www.nigc.gov/images/uploads/game-opinions/SubmittingRequestforLegalOpinionDec112013.pdf.

Because the IGRA did not require it and the Chairman or the Commission did not issue it, the Court concludes that the OGC's advisory opinion is not a decision by the NIGC itself. Thus, it cannot consummate an NIGC decision-making process.  Plaintiffs therefore have failed to show that the advisory opinion satisfies the first prong of the *Bennett* test.

The OGC's advisory opinion also fails the second prong of the *Bennett* test.  This part of the standard asks whether the agency's action imposes legal obligations or consequences on plaintiffs.  As explained above, the IGRA does not require the OGC to issue an advisory opinion before the Quapaw may game on the Kansas Land.  Thus, the OGC's opinion had no effect on the status quo.  While plaintiffs contend that the opinion requires the State to negotiate a Tribal-State gaming compact, this argument misapprehends the State's responsibility under the IGRA. The State must negotiate a compact only if the Quapaw builds a gaming facility in Kansas, decides to conduct class III gaming there, and requests the State enter into negotiations on a Tribal-State compact "governing the conduct of [class III] gaming activities."[2]  25 U.S.C.

---

[2]     Section 2710(d)(3)(A) of the IGRA requires the State to negotiate "with the Indian tribe in good faith to enter into such a compact."  If the State refuses to negotiate a compact with the Tribe or does not negotiate in good faith, the Tribe may bring suit in federal district court to resolve the issue under the procedure set out in 25 U.S.C. § 2710(d)(7).

§ 2710(d)(3)(A) (requiring tribe who wishes to conduct class III gaming on Indian lands to request the state to negotiate a Tribal-State compact).

Because plaintiffs have failed to demonstrate that the OGC's advisory opinion was final NIGC action, the Court concludes that it does not have subject matter jurisdiction to review it. The NIGC and its officials have not waived sovereign immunity under the IGRA or APA. The Court thus dismisses plaintiffs' claims against the federal defendants in Counts I and II of the Amended Complaint.[3]

### B.  Motion to Dismiss Under Rule 12(b)(6) for Failure to State a Claim

#### 1.  The parties' positions

Plaintiffs attack the DOI's promulgation and the NIGC's application of 24 C.F.R. § 292.4 in Count III of their Amended Complaint. Specifically, they challenge the regulatory interpretation of the term "presently located" in 25 C.F.R. § 292.4(b)(2).

The DOI's Bureau of Indian Affairs promulgated § 292.4 in 2008 to define and implement the IGRA's last recognized reservation exception (25 U.S.C. § 2719(a)). Section 292.4(b)(2) provides that a tribe that acquires land after October 17, 1988, satisfies the exception if its land is: "Located in a State other than Oklahoma and [is] within the tribe's last recognized reservation with the State or States within which the tribe is presently located, *as evidenced by the tribe's governmental presence and tribal population*." (emphasis added).

---

[3]     Plaintiffs' response in opposition (Doc. 60) alternatively asks the Court, if it determines that the OGC advisory opinion is not a final agency action, to issue an order "prohibiting the Quapaw defendants from gaming on the land unless and until a final agency decision regarding the eligibility of the land for gaming is made." Doc. 60 at 13. But, as plaintiffs concede, "[n]othing in the text of the IGRA . . . requires the NIGC to determine whether the land meets the last recognized reservation exception when a tribe licenses or begins construction of a class II or class III gaming facility already authorized by a non-site-specific ordinance." Doc. 60 at 6; *see also Bd. of Comm'rs of Cherokee Cty., Kan. v. Jewel*, 956 F. Supp. 2d 116, 124-25 (D.C.C. 2013) (finding no statutory or regulatory basis for requiring the NIGC or Secretary of the Interior to determine the gaming eligibility of land on which a tribe plans to game). The Court therefore declines to grant the relief that this request seeks.

Plaintiffs note that Congress did not define "presently located" in 25 U.S.C. § 2719(a). They also assert that the DOI's definition of "presently located" in 25 C.F.R. § 292.4(b)(2) conflicts with this Court's interpretation of the term in *Wyandotte Nation*, a case decided two years before the DOI adopted § 292.4.  *See* 437 F. Supp. 2d at 1206.  In *Wyandotte Nation*, the Court held that a tribe is "presently located" where it "has its population center and 'major governmental presence.'"  *Id*. (emphasis omitted).  Plaintiffs assert that "[b]y failing to recognize *Wyandotte Nation*[*'s*] . . . major governmental presence standard, the DOI acted arbitrarily and in excess of its authority, and 25 C.F.R. § 292.4 should be declared null and void."  Doc. 13 at 16.  Plaintiffs also assert that the DOI acted arbitrarily and exceeded its authority by "failing to include in 25 C.F.R. § 292.4 a requirement that the tribe's location be determined as of the date of IGRA's effectiveness, October 17, 1988[.]"  *Id*.

The federal defendants advance four independent reasons why the Court should dismiss plaintiffs' challenge to 25 C.F.R. § 292.4.  First, they contend that plaintiffs' challenge is barred by the six-year statute of limitations established in 28 U.S.C. § 2401.  Second, the federal defendants assert that plaintiffs waived their ability to challenge 25 C.F.R. § 292.4(b)(2) by failing to assert their challenge during the DOI's notice-and-comment rulemaking.  Third, the federal defendants argue that the DOI was not bound by *Wyandotte Nation*'s definition of "presently located" during its 2008 promulgation of 25 C.F.R. § 292.4.  And last, the federal defendants assert that plaintiffs' contention that the term "presently located" must be interpreted as a "date-of-enactment" restriction is wrong as a matter of law.  As the next section explains, the Court concludes that plaintiffs are time-barred from challenging this regulation.

### 2. Plaintiffs' challenge to 25 C.F.R. § 292.4 is barred by the six-year statute of limitations.

The federal defendants move to dismiss plaintiffs' challenge against 25 C.F.R. § 292.4 because, they contend, it is a facial challenge to a regulation and 28 U.S.C. § 2401(a)'s six-year statute of limitation time-bars such a challenge now. Plaintiffs respond that their action is not a facial challenge. Instead, plaintiffs assert that they challenge the regulation "as-applied" because their "suit is primarily a challenge to the NIGC's land opinion that gaming is permitted on the [Kansas Land]" and they have attacked "the regulation on which the NIGC relied." Doc. 60 at 15.

Our Circuit has provided standards district courts must use to distinguish between a facial challenge and an as-applied challenge. The former "'considers [the regulation's] application to all conceivable parties.'" *iMatter Utah v. Njord*, 774 F.3d 1258, 1264 (10th Cir. 2014) (quoting *Colo. Right to Life Comm., Inc. v. Coffman*, 498 F.3d 1137, 1146 (10th Cir. 2007)). In contrast, an as-applied challenge "'tests the application of that [disputed regulation] to the facts of a plaintiff's concrete case.'" *Id.*

This distinction matters because a plaintiff hoping to prosecute a facial challenge must assert it within six years of the regulation's publication in the Federal Register. *See, e.g., Wind River Mining Corp. v. United States*, 946 F.2d 710, 714-15 (9th Cir. 1991) (applying 28 U.S.C. § 2401(a)'s six-year statute of limitation to request for judicial review under the APA). *Wind River* explains the rationale for this outcome: "The grounds for such challenges will usually be apparent to any interested citizen within a six-year period following promulgation of the decision" and the "government's interest in finality outweighs a late-comer's desire to protest the agency's action as a matter of procedure." *Id.* at 715.

An as-applied challenge is not subject to the same limitation.  Instead, a plaintiff who challenges an agency's application of a regulation to the plaintiff's specific circumstances must file its action within six years of an adverse agency decision.  *See id.* at 716 ("We hold that a substantive challenge to an agency decision alleging lack of agency authority may be brought within six years of the agency's application of that decision to the specific challenger."); *see also Functional Music, Inc. v. F.C.C.*, 274 F.2d 543, 546 (D.C. Cir. 1958), *cert. denied*, 361 U.S. 813 (1959).  Also, the APA requires that an "as applied challenge must rest on final agency action." *Crosby Lodge, Inc. v. Nat'l Indian Gaming Comm'n*, No. 3:06-cv-00657-LRH-RAM, 2008 WL 5111036, at *6 (D. Nev. Dec. 3, 2008) ("'Agency action made reviewable by statute and final agency action for which there is no remedy in a court are subject to judicial review.'" (quoting 5 U.S.C. § 704.)).

Count III of plaintiffs' Amended Complaint asserts several objections to the DOI's promulgation of 25 C.F.R. § 292.4(b)(2).  It tries to advance an as-applied challenge against the NIGC, alleging:  "The NIGC's actions in applying 25 C.F.R. § 292.4(b)(2) to the current location of the tribe, and in a manner inconsistent with *Carcieri*, are arbitrary and in excess of its authority."  Doc. 13 at 17.  But this allegation cannot serve as the basis for an as-applied challenge.  Plaintiffs' challenge arises from the OGC's advisory opinion.  Because the opinion, and its application of § 292.4, was not final NIGC action ripe for judicial review, plaintiffs cannot assert an as-applied challenge based on it.  *See* 5 U.S.C. § 704; *see also Crosby Lodge, Inc.*, 2008 WL 5111036, at *6.  Thus, plaintiffs have failed to assert a viable as-applied challenge to 25 C.F.R. § 292.4.

This leaves plaintiffs' claims against the DOI's promulgation of § 292.4.  Specifically, plaintiffs contend that the DOI acted "arbitrarily and in excess of its authority" by:  (1) "failing

to recognize *Wyandotte Nation v. NIGC*'s major governmental standard;" and (2) "failing to include in 25 C.F.R. § 292.4 a requirement that the tribe's location be determined as of the date of IGRA's effectiveness" in a "manner [consistent] with *Carcieri*." Doc. 13 at 16. Plaintiffs also ask the Court to "[d]eclare that the DOI acted arbitrarily and in excess of its authority by implementing 25 C.F.R. § 292.4(b)(2) without a temporal restriction, and in a manner that does not rely on tribes' major governmental presence." *Id*. at 18.

The Court concludes that these attacks on the DOI's implementation of 25 C.F.R. § 292.4 amount to facial challenges to the validity of the regulation itself. Plaintiffs contend, in essence, that the DOI acted arbitrarily and exceeded its authority when it promulgated § 292.4. Plaintiffs therefore contend that the regulation is invalid as written—an alleged defect that would affect all conceivable parties. *See Njord*, 774 F.3d at 1264. The grounds for plaintiffs' challenge—*i.e.*, the IGRA, *Wyandotte Nation*, and *Carcieri*—existed in 2008 when the DOI published the regulation in the Federal Register and were "apparent to any interested citizen" within six years of publication. *Wind River Mining Corp.*, 946 F.2d at 715. Because plaintiffs failed to assert their facial challenge to § 292.4 within the six-year period of limitation set out in 28 U.S.C. § 2401(a), it is time-barred as a matter of law. The Court thus dismisses Count III of plaintiffs' Amended Complaint.[4]

## IV.    Tribal Defendants' Motions to Dismiss

The Court turns now to the five motions to dismiss filed by the tribal defendants. The tribal defendants seek to dismiss plaintiffs' claims against them for lack of subject matter jurisdiction under Rule 12(b)(1). The tribal defendants contend that the Court lacks jurisdiction for two reasons.

---

[4]      Given this conclusion, the Court need not address the federal defendants' other attacks on plaintiffs' challenge to § 292.4.

First, as entities and members of a federally recognized Indian tribe, they assert that tribal immunity shields them from suit in federal court.  Plaintiffs respond that the Downstream Development Authority's tribal charter contains provisions that amount to a blanket waiver of the DDA's tribal immunity.  To support their argument, plaintiffs attach a Quapaw tribal resolution chartering the DDA and reference the DDA's complete charter in their response in opposition (Doc. 56).  Resolution of this issue requires the Court to examine the DDA charter, which plaintiffs did not attach to or reference in their Amended Complaint.  Thus, the Court must consider documents outside of the complaint and will not presume that all of plaintiffs' jurisdictional allegations are true.  *See Holt*, 46 F.3d at 1003.

Second, the tribal defendants assert that plaintiffs cannot sidestep tribal immunity by bringing an officer suit against tribal officials under *Ex parte Young*, 209 U.S. 123 (1908).  The tribal defendants attack both the "legal [and] factual merit [of] the State's claims against the Tribal officers" through their motions to dismiss.  Doc. 51 at 11.  Thus, the tribal defendants ask the Court to address both the propriety of jurisdiction (a Rule 12(b)(1) motion) and the plausibility of plaintiffs' claims (a Rule 12(b)(6) motion).  Before reaching the merits of plaintiffs' substantive claims, the Court first must determine whether it has subject matter jurisdiction over the 18 individual tribal officers under *Ex parte Young*.  *See Muscogee (Creek) Nation*, 669 F.3d at 1167-68.  If it finds that jurisdiction exists, the Court may then take up the tribal defendants' substantive arguments under Rule 12(b)(6).  *See Holt*, 46 F.3d at 1003; *Pringle*, 208 F.3d at 1223.  The Court addresses each one of the tribal defendants' arguments below.

**A.  Plaintiffs have failed to establish that the tribal defendants have waived tribal immunity.**

"Indian tribes are 'domestic dependent nations' that exercise 'inherent sovereign authority.'"  *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2030 (2014) (quoting *Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla.*, 498 U.S. 505, 509 (1991)).  Thus, "[a]s a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity."  *Kiowa Tribe of Okla. v. Mfg. Tech., Inc.*, 523 U.S. 751, 754 (1998).  "To abrogate tribal immunity, Congress must 'unequivocally' express that purpose."  *C&L Enters., Inc. v. Citizen Band Potawatomi Indian Tribe of Okla.*, 532 U.S. 411, 418 (2001) (quoting *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978)).  Likewise, an Indian tribe's waiver of its tribal immunity must be unequivocal.  *Id.*; *see E.F.W. v. St. Stephen's Indian High School*, 264 F.3d 1297, 1304 (10th Cir. 2001).

Tribal immunity "may extend to subdivisions of a tribe, including those engaged in economic activities . . . ."  *Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino and Resort*, 629 F.3d 1173, 1183 (10th Cir. 2010) (citing *Native Am. Distrib. v. Seneca-Cayuga Tobacco Co.*, 546 F.3d 1288, 1292 (10th Cir. 2008)).  Granting immunity to tribal businesses furthers "'Congress' desire to promote the goal of Indian self-government, including its overriding goal of encouraging tribal self-sufficiency and economic development.'"  *Id.* (quoting *Okla Tax Comm'n*, 498 U.S. at 510).  Generally, tribal immunity also extends to tribal officials acting in their official capacities and within the scope of their authority.  *See Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1154 (10th Cir. 2011) (citing *Fletcher v. United States*, 116 F.3d 1315, 1324 (10th Cir. 1997)).

Plaintiffs contend that the Quapaw has waived the DDA's tribal immunity expressly by its charter.  Plaintiffs assert that the charter exposes the DDA to suit because it permits the DDA

to "[s]ue Persons in its own name" and to "[c]onsent to the exercise of jurisdiction over any suit or over the Authority by the federal courts." Doc. 56-1 at 8. Plaintiffs characterize these provisions as a "sue and be sued clause." And, according to plaintiffs, at least three federal circuits, including our own, have held that such clauses waive a tribal corporation's immunity. *See, e.g., Native Am. Distrib.*, 546 F.3d at 1288 (affirming district court opinion); *Marceau v. Blackfeet Hous. Auth.*, 455 F.3d 974, 979-81 (9th Cir. 2006), *vacated*, 540 F.3d 916, 921 (9th Cir. 2008); *Rosebud Sioux Tribe v. A&P Steel, Inc.*, 874 F.2d 550, 552 (8th Cir. 1989).

In response, the tribal defendants contend that the provisions of the DDA's charter are not a "sue and be sued clause" and thus did not waive immunity. Instead, they contend that the DDA's provisions authorized the DDA to waive its tribal immunity on a transaction-by-transaction basis. Tribal defendants note that the DDA charter also provides that it "shall be entitled to all of the privileges and immunities of the Tribe, including without limitation, sovereign immunity from suit." Doc. 73 at 3.

As discussed above, a tribe or tribal entity must express any intent to waive tribal immunity in unequivocal words. *See C&L Enters., Inc.,* 532 U.S. at 418; *Breakthrough Mgmt. Grp.*, 629 F.3d at 1183-84. Here, the DDA's tribal charter grants it the power to "[c]onsent to the exercise of jurisdiction over the Authority by the federal courts . . . ." Doc. 56-1 at 7 (emphasis added). This language does not manifest an intent to waive tribal immunity. Instead, it vests the DDA with the power to waive its immunity at its election. *See Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Hous. Auth.*, 207 F.3d 21, 30 (1st Cir. 2000) (finding no waiver of immunity where the "ordinance . . . authorizes the Authority to shed its immunity from suit 'by contract,' and these words would be utter surplusage if the enactment of the ordinance itself served to perfect the waiver").

30

For this reason, the provisions of the DDA charter differ from the traditional "sue and be sued clauses" cited by plaintiffs.  Indeed, the clauses on which plaintiffs rely demonstrate that the tribes in those cases intended to shed the immunity of their corporate entities.  *See Marceau*, 455 F.3d at 979-81 (clause giving "irrevocable consent to [allow] the [tribal] Authority to sue and be sued in its corporate name, upon any contract, claim, or obligation" amounts to an express waiver of tribal immunity); *Rosebud Sioux Tribe*, 874 F.2d at 552 (tribal charter permitting entity "[t]o sue and to be sued in courts of competent jurisdiction" waived immunity); *Native Am. Distrib. v. Seneca-Cayuga Tobacco, Co.*, 491 F. Supp. 2d 1056, 1065 (N.D. Okla. 2007) (charter allowing entity "[t]o sue and be sued; to defend in any court" constituted a waiver of tribal immunity).  In contrast, the DDA's charter does not expose the DDA to suit in any context.

Here, the charter evinces the Quapaw's intent to preserve the DDA's tribal immunity. The Quapaw granted the DDA the ability to decide when, and under what circumstances to waive its immunity.  The charter itself shows as much.  Section 6 authorizes the DDA to "[g]rant limited waivers of the sovereign immunity of the Authority to enter into contracts or agreements or other business relations . . . ."  Doc. 56-1 at 8.  And Section 8 provides that the DDA is an "instrumentality of the Tribe," "enjoys an autonomous existence[,]" and "*shall be entitled to . . . sovereign immunity from suit.*"  *Id.* (emphasis added).  Thus, the charter contains no unequivocal waiver of tribal immunity.

In sum, plaintiffs have adduced no facts plausibly supporting the conclusion that the DDA, the QCA, or the TDC have waived tribal immunity.  Because plaintiffs have failed to establish that the Court has subject matter jurisdiction over these three entities, the Court dismisses plaintiffs' claims against them under Rule 12(b)(1).

**B.  Plaintiffs cannot establish subject matter jurisdiction over individual tribal officers under *Ex Parte Young*.**

Next, the tribal defendants ask the Court to dismiss plaintiffs' claims against the 18 individual tribal officers.  This aspect of the Amended Complaint tries to overcome tribal immunity by asserting claims against the officers under the exception established in *Ex parte Young*, 209 U.S. 123 (1908).  "[U]nder *Ex parte Young*, a plaintiff may bring suit against individual state officers acting in their official capacities if the complaint alleges an ongoing violation of federal law and the plaintiff seeks prospective relief."  *Muscogee (Creek) Nation*, 669 F.3d at 1166 (citing *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)).  The *Ex parte Young* exception applies "not just to state sovereign immunity but also to tribal sovereign immunity."  *Crowe & Dunlevy, P.C.*, 640 F.3d at 1154.

To determine whether plaintiffs may bring claims against the tribal officers, the Court "'need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'"  *Muscogee (Creek) Nation*, 669 F.3d at 1167 (quoting *Verizon Md. Inc.*, 535 U.S. at 645).  Plaintiffs allege an ongoing violation of federal law if they state a "'non-frivolous, substantial claim for relief against the [tribal] officers that does not merely allege a violation of federal law solely for the purpose of obtaining jurisdiction.'"  *Id.* (quoting *Chaffin v. Kan. State Fair Bd.*, 348 F.3d 850, 866 (10th Cir. 2003)).  "But the inquiry into whether suit lies under *Ex parte Young* does not include an analysis of the merits of the claim."  *Verizon Md. Inc.*, 535 U.S. at 636-37 (citing *Idaho v. Coeur d'Alene*, 521 U.S. 261, 281 (1997)).

Here, plaintiffs have asserted claims against individual tribal officers and have asked the Court to enjoin them from constructing or operating "an illegal, unauthorized gaming facility" on the Kansas Land.  Doc. 13 at 17.  Plaintiffs emphasize the request that the Quapaw made in its

2012 application to the BIA.  It asked the BIA to take the Kansas Land into a trust that the

Quapaw intended to use for non-gaming purposes.  Because plaintiffs say that they relied on this

representation when they decided not to appeal the BIA's decision, plaintiffs argue that the Court

must declare the tribal defendants equitably estopped from gaming.  Plaintiffs assert that "[i]f the

[t]ribal [d]efendants game on the Kansas [L]and, they will be in violation of IGRA[,] as the land

does not meet the exception set forth in 25 U.S.C. § 2719 and is not eligible for gaming."  Doc.

56 at 11.

The tribal defendants respond, contending that plaintiffs may not circumvent tribal

immunity merely by asserting a claim characterized as equitable estoppel.  The tribal defendants

contend that the Eleventh Amendment bars plaintiffs' claim because it is frivolous and asserted

only to obtain jurisdiction.  The tribal defendants also assert:  plaintiffs have failed to allege an

ongoing violation of federal law; *Ex parte Young* cannot apply because the tribal officers named

by plaintiffs have no authority to act individually; and application of *Ex parte Young* requires a

violation of the "supreme law" of the United States and equitable estoppel is only a civil remedy.

Beginning with the tribal defendants' first argument—that plaintiffs assert an equitable

estoppel claim merely to circumvent the IGRA's jurisdictional limitations—the Court returns to

the fundamental purpose of the IGRA.  Congress enacted the IGRA "to provide a statutory basis

for the operation and regulation of gaming by Indian tribes."  *Seminole Tribe of Fla. v. Florida*,

517 U.S. 44, 48 (1996) (citing 25 U.S.C. § 2702).  The IGRA grants Indian tribes exclusive

jurisdiction to regulate gaming on Indian lands if:  (1) "the gaming activity is not specifically

prohibited by Federal law;" and (2) it "is conducted within a state which does not, as a matter of

criminal law and public policy, prohibit such gaming activity."  25 U.S.C. § 2701(5).  The IGRA

33

also defines when a state may sue an Indian tribe for gaming violations on Indian lands.  *See* 25

U.S.C. § 2710(d)(7)(A).  Section 2710(d)(7)(A)(ii), in relevant part, provides:

> The United States district courts shall have jurisdiction over . . . any cause of action initiated by a State . . . to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact entered into under paragraph (3) that is in effect.

 But the Supreme Court has determined that § 2710(d)(7)(A)(ii) "does not even cover all suits

[seeking] to enjoin gaming on Indian lands . . . ."  *Bay Mills Indian Cmty.*, 134 S. Ct. at 2034 n.6.

Instead, the Court has determined:

> Section 2710(d)(7)(A)(ii) recall, allows a State to sue a tribe not for all class III gaming activity located on Indian lands . . . , but only for such gaming as is conducted in violation of any Tribal-State compact . . . that is in effect. Accordingly, *if a tribe opens a casino on Indian lands before negotiating a compact, the surrounding State cannot sue*; only the Federal Government can enforce the law.  *See* 18 U.S.C. § 1166(d).

*Id*. (emphasis added) (internal quotations omitted).

The Supreme Court also has held that "where Congress has prescribed a detailed

remedial scheme for the enforcement against a [tribe] of a statutorily created right"—such as that

set out in § 2710(d)(7)—"a court should hesitate before casting aside those limitations and

permitting an action against a [tribal] officer based upon *Ex parte Young*."  *Seminole Tribe of*

*Fla.*, 517 U.S. at 74.  Thus, if plaintiffs' equitable estoppel claim here seeks to prevent a

threatened violation of the IGRA, jurisdiction against the tribal officers does not exist under *Ex*

*parte Young*.

Plaintiffs argue that their claims against the tribal officers "arise not under the IGRA

specifically, but from the common law principles of equitable estoppel."  Doc. 56 at 12.

Plaintiffs contend that the tribal defendants misrepresented their intended use of the Kansas Land

and, therefore, deprived plaintiffs of the opportunity to contest the Quapaw's BIA trust

application.  Thus, according to plaintiffs, no statutory rights under the IGRA are at issue.  But

plaintiffs' response in opposition contains numerous statements indicating otherwise.

> For example, plaintiffs' introduction, in relevant part, provides:
>
> Because the Kansas [L]and does not meet the [25 U.S.C. § 2719] exception, constructing and operating a casino on the land would violate the Indian Regulatory Gaming Act, 25 U.S.C. §§ 2701-2721 ("IGRA") and the [t]ribal [d]efendants should be estopped from doing so based on their representations to the BIA.

Doc. 56 at 2.  Later, plaintiffs contend that they have alleged an ongoing violation of federal law

under *Ex parte Young* because they are "prospectively ensuring that the [t]ribal [d]efendants do

not act upon [the NIGC opinion] letter because the NIGC's application of the 'last reservation

exception' is wrong, and to conduct gaming on such land would be a violation of IGRA and

federal law."  Doc. 56 at 9.  Plaintiffs' response continues, stating:

> IGRA prohibits [t]ribes from conducting gaming, including Class II gaming, on lands acquired by the Secretary in trust for the benefit of an Indian tribe after October 17, 1988, unless certain requirements are met.  25 U.S.C. §§ 2710(a)(2), 2719.  *The Amended Complaint alleges that to conduct gaming on the [t]ribe's trust land in Kansas would not meet those requirements and thus, constitute a violation of federal law*.  [Doc. 13 at 9, 14-17.]  Thus, the Amended Complaint seeks prospective relief to prevent the tribal members from acting in violation of federal law.

*Id*. at 9 (emphasis added).  Finally, plaintiffs argue:  "If the Tribal Defendants game on the

Kansas land, they will be in violation of the IGRA as the land does not meet the exception set

forth in 25 U.S.C. § 2719 and is not eligible for gaming."  Doc. 56 at 11.

To determine whether relief sought by a party is permitted under *Ex parte Young*, the

Court must "look to the substance rather than to the form of the relief sought . . . ."  *Papasan v.*

*Allain*, 478 U.S. 265, 279 (1986).  Plaintiffs here assert a claim they call "equitable estoppel."

But it is evident that they seek to prevent the tribal defendants from committing an alleged

violation of the IGRA—*i.e.*, gaming in violation of 25 U.S.C. § 2719.  Plaintiffs cannot use *Ex*

*parte Young* to bring such a claim.  *See Seminole Tribe of Fla.*, 517 U.S. at 74 (affirming

dismissal of *Ex parte Young* suit seeking to remedy alleged IGRA violation because Congress

enacted the IGRA as a detailed remedial scheme designed to address such violations); *see also*

*Bay Mills Indian Cmty.*, 134 S. Ct. at 2034 n.6 ("[I]f a tribe opens a casino on Indian lands before

negotiating a compact, the surrounding State cannot sue; only the Federal Government can

enforce the law.").

Even if plaintiffs' Amended Complaint did not seek to deter a potential violation of the

IGRA, their equitable estoppel claim still would not satisfy *Ex parte Young*.  As discussed above,

application of *Ex parte Young* requires a party to allege an ongoing violation of federal law and

seek prospective relief.  *See Muscogee (Creek) Nation*, 669 F.3d at 1166.  Plaintiffs, however,

assert that the Quapaw misrepresented its intended use for the Kansas Land during its 2012 BIA

land-into-trust proceeding and "deprived plaintiffs the opportunity to be fully heard during the

trust application process."  Doc. 56 at 12.  This alleged misrepresentation happened in the past.

Thus, plaintiffs do not assert an ongoing or threatened violation of federal law.  Instead, they

seek to remedy something even they perceive as a past wrong, and this cannot abide a suit under

*Ex parte Young*.  *See Papasan*, 478 U.S. at 277-78 ("*Young* has been focused on cases in which a

violation of federal law . . . is ongoing as opposed to cases in which federal law has been violated

at one time or over a period of time in the past . . . ."); *Fuller v. Davis*, 594 F. App'x 935, 940

(10th Cir. 2014) (finding *Ex parte Young* inapplicable where plaintiffs claimed "they were

tricked long ago" because the relief requested would "address alleged past harms rather than

prevent prospective violations of federal law") (internal quotations omitted); *Sanders v. Kan.*

*Dep't of Soc. & Rehab. Servs.*, 317 F. Supp. 2d 1233, 1243-44 (D. Kan. 2004) (denying *Ex parte*

*Young* jurisdiction where suit would not "remedy any future wrongs, and it does not appear that the circumstances . . . will reoccur with any level of frequency, if at all.").

The Court concludes that the *Ex parte Young* exception to tribal immunity does not apply to plaintiffs' claims against the individual tribal defendants. The Eleventh Amendment therefore shields the tribal defendants from this suit in federal court. The Court thus dismisses plaintiffs' claims against the tribal defendants under Rule 12(b)(1).

## V.    Conclusion

Plaintiffs have failed to establish that this Court has subject matter jurisdiction over their claims against the tribal defendants, the NIGC, or the named NIGC officials. In addition, plaintiffs' claims against the DOI and its officials are barred by 25 U.S.C. § 2401(a). For reasons explained by this Order, the Court grants the federal defendants and tribal defendants' motions to dismiss.

**IT IS THEREFORE ORDERED BY THE COURT THAT** the federal defendants' Motion to Dismiss (Doc. 42) is granted.

**IT IS FURTHER ORDERED THAT** the tribal defendants' Motions to Dismiss for Lack of Jurisdiction (Docs. 50, 55, 68, 76, 86) are granted.

**IT IS FURTHER ORDERED THAT** plaintiffs' Motion for Preliminary Injunction (Doc. 14) and the tribal defendants' Motion to Continue or Stay Proceedings on Pending Request for Preliminary Injunction (Doc. 87) are denied as moot.

**IT IS FURTHER ORDERED THAT** the Iowa Tribe of Kansas and Nebraska and Sac and Fox Nation of Missouri's Motion to Intervene (Doc. 58) and the tribal defendants' Unopposed Motion to Continue Response to Motion to Intervene (Doc. 79) are denied as moot.

**IT IS SO ORDERED.**

Dated this 17th day of December, 2015, at Topeka, Kansas.


s/ Daniel D. Crabtree
Daniel D. Crabtree
United States District Judge